JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Joseph Juisti

## DEFENDANTS

City of Chester; Thaddeus Kirkland; Otis Blair; James Nolan; Steven Gretsky; Manlyn Lee; William Shaw; FOP Lodge 19; Randy Bothwell

**(b)** County of Residence of First Listed Plaintiff    Chester
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Delaware County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Gerard P. Egan and Brian L. McCarthy, Egan & McCarthy, 657 Exton Commons, Exton, PA 19341, 610-567-3436

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government<br>Plaintiff | ☒ 3 | Federal Question<br>*(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government<br>Defendant | ☐ 4 | Diversity<br>*(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>  & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>  Student Loans<br>  (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>  of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>  Liability<br>☐ 320 Assault, Libel &<br>  Slander<br>☐ 330 Federal Employers'<br>  Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>  Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>  Product Liability<br>☐ 360 Other Personal<br>  Injury<br>☐ 362 Personal Injury -<br>  Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br>  Product Liability<br>☐ 367 Health Care/<br>  Pharmaceutical<br>  Personal Injury<br>  Product Liability<br>☐ 368 Asbestos Personal<br>  Injury Product<br>  Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>  Property Damage<br>☐ 385 Property Damage<br>  Product Liability | ☐ 625 Drug Related Seizure<br>  of Property 21 USC 881<br>☐ 690 Other<br><br><br><br>**LABOR**<br>☐ 710 Fair Labor Standards<br>  Act<br>☐ 720 Labor/Management<br>  Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>  Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>  Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>  28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br>  New Drug Application<br>☐ 840 Trademark<br><br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>  3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>  Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>  Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br>  Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☒ 442 Employment<br>☐ 443 Housing/<br>  Accommodations<br>☐ 445 Amer. w/Disabilities -<br>  Employment<br>☐ 446 Amer. w/Disabilities -<br>  Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>  Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>  Conditions of<br>  Confinement | <br><br><br><br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>  Actions | ☐ 870 Taxes (U.S. Plaintiff<br>  or Defendant)<br>☐ 871 IRS—Third Party<br>  26 USC 7609 | ☐ 899 Administrative Procedure<br>  Act/Review or Appeal of<br>  Agency Decision<br>☐ 950 Constitutionality of<br>  State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☐ 1 Original<br>Proceeding | ☐ 2 Removed from<br>State Court | ☐ 3 Remanded from<br>Appellate Court | ☐ 4 Reinstated or<br>Reopened | ☐ 5 Transferred from<br>Another District<br>*(specify)* | ☐ 6 Multidistrict<br>Litigation -<br>Transfer | ☐ 8 Multidistrict<br>Litigation -<br>Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII of Civil Rights Act of 1964; Americans with Disabilities Act of 1990; 42 U.S.C. 1983

Brief description of cause:
Employment discrimination, retaliation, and violation of procedural due process "stigma plus"

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                 DOCKET NUMBER

DATE
06/01/2018

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #       AMOUNT       APPLYING IFP       JUDGE       MAG. JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 3349 Alydar Road, Downingtown, PA 19335

Address of Defendant: 1 E. Fourth Street, Chester, PA 19013

Place of Accident, Incident or Transaction: City of Chester, Pennsylvania, Delaware County

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 06/01/2018 _____ 319722

Attorney-at-Law / Pro Se Plaintiff    Attorney I.D. # (if applicable)

---

CIVIL: (Place a √ in one category only)

**A.**   *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☑ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
*(Please specify):*

**B.**   *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):*
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
*(Please specify).*

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Brian L. McCarthy , counsel of record or pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: 06/01/2018 _____ 319722

Attorney-at-Law / Pro Se Plaintiff    Attorney I.D. # (if applicable)

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 3349 Alydar Road, Downingtown, PA 19335

Address of Defendant: _____ 1 E. Fourth Street, Chester, PA 19013

Place of Accident, Incident or Transaction: _____ City of Chester, Pennsylvania, Delaware County

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 06/01/2018 _____ 319722
*Attorney-at-Law / Pro Se Plaintiff* _____ *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☑ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
*(Please specify):* _____

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury *(Please specify):*
7. ☐ Products Liability
8. ☐ Products Liability – Asbestos
9. ☐ All other Diversity Cases *(Please specify)*

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Brian L. McCarthy _____, counsel of record or pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 06/01/2018 _____ 319722
*Attorney-at-Law / Pro Se Plaintiff* _____ *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

Joseph Trist.                          :         CIVIL ACTION
                    v.                 :
City of chester et al.                 :
                                       :         NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.                    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)                    ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.         (X)

06/01/14            Brian McClarsh              Plaintiff Joseph Trist.
**Date**            **Attorney-at-law**         **Attorney for**

610 567 3436        1 610 423 5885             eganmcclarthylaw@gmail.cm
**Telephone**       **FAX Number**              **E-Mail Address**

(Civ. 660) 10/02

Egan & McCarthy, Attorneys at Law
Gerard P. Egan, Esq. (20744)
Brian L. McCarthy, Esq. (319722)
657 Exton Commons
Exton, PA 19341
610-567-3436

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH JUISTI** | : | **CIVIL ACTION** |
| | : | |
|     3349 Alydar Road | : | |
|     Downingtown, PA 19335 | : | **No.** _____ |
| | : | |
|     Plaintiff | : | |
| | : | **JURY TRIAL BY TWELVE** |
| v. | : | **(12) JURORS DEMANDED** |
| | : | |
| **CITY OF CHESTER** | : | |
| | : | |
|     1 E Fourth Street | : | |
|     Chester, PA 19013 | : | |
| and | : | |
| | : | |
| **MAYOR THADDEUS KIRKLAND** | : | |
| | : | |
| In his individual and | : | |
| official capacities | : | |
| | : | |
|     1 E Fourth Street | : | |
|     Chester, PA 19013 | : | |
| and | : | |
| | : | |
| **COMMISSIONER OTIS BLAIR** | : | |
| | : | |
| In his individual and | : | |
| official capacities | : | |
| | : | |
|     160 E Seventh Street | : | |
|     Chester, PA 19013 | : | |
| and | : | |
| | : | |

1

CHIEF JAMES E. NOLAN IV                            :
                                                   :
In his individual and                              :
official capacities                                :
                                                   :
          160 E Seventh Street                     :
          Chester, PA 19013                        :
and                                                :
                                                   :
MAJOR STEVEN GRETSKY                               :
                                                   :
In his individual and official capacities          :
                                                   :
          160 E Seventh Street                     :
          Chester, PA 19013                        :
and                                                :
                                                   :
CAPTAIN MARILYN LEE                                :
                                                   :
In her individual and                              :
official capacities                                :
                                                   :
          160 E Seventh Street                     :
          Chester, PA 19013                        :
and                                                :
                                                   :
CAPTAIN WILLIAM SHAW                               :
                                                   :
In his individual and official capacities          :
                                                   :
          160 E Seventh Street                     :
          Chester, PA 19013                        :
and                                                :
                                                   :
FRATERNAL ORDER OF POLICE                          :
WILLIAM PENN LODGE No. 19                          :
                                                   :
          P.O. Box 820                             :
          Chester, PA 19016                        :
and                                                :
                                                   :
RANDY BOTHWELL                                     :
                                                   :
In his individual and official capacities          :
                                                   :
          160 E Seventh Street                     :

Chester, PA 19013                    :

## CIVIL COMPLAINT

NOW COMES Plaintiff Joseph Juisti who, by and through counsel, bring this action for damages suffered as a result of the unlawful actions of the above-captioned Defendants pursuant to 42 U.S.C. §§ 1983 and 1985(2), and related state law claims pursuant to Federal Rule of Civil Procedure 1367(a). In support thereof, Plaintiff avers the following:

### Parties and Nature of the Action

1. Plaintiff Joseph Juisti is an adult individual who has worked as a Patrolman, badge number 313, for the Chester Police Department for the City of Chester since 2013, whose primary residence is 3349 Alydar Avenue, Downingtown, PA 19335, in Chester County.

2. This action is based on a campaign of discriminatory harassment, psychological and emotional torment, and shameless retaliation carried out by the highest echelons of the City of Chester government, including its Mayor and Police Commissioner, against Plaintiff Juisti for attempting to lawfully carry out his duties as a police officer in the face of unabashed corruption and cronyism.

3. Specifically, Mr. Juisti raises claims under 42 U.S.C. §§ 1983 and 1985 for deprivation of Mr. Juisti's procedural due process rights under the "stigma plus" doctrine and retaliation by the Defendants against Mr. Juisti for his repeated filing of unanswered grievances and other attempts to report misconduct against his superiors as well as Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff also raises associated state claims in connection with these causes of action.

4.  Defendant City of Chester is a Pennsylvania municipality which employs 15 or more
    employees throughout the year, and Plaintiff's employer at all relevant times herein, with a
    primary address of 1 E Fourth Street, Chester, Pennsylvania, 19013, in Delaware County.

5.  Defendant Thaddeus Kirkland is the Mayor of Defendant City of Chester, is being sued in
    his official and individual capacities, and whose primary address at all relevant times
    herein was 1 E Fourth Street, Chester, Pennsylvania 19013, in Delaware County.

6.  Under the City of Chester's Charter, Defendant Kirkland, as Mayor of the City of Chester,
    is the Chief Executive of the City and is specifically required to "supervise the conduct of
    all city officers, examine the grounds of all reasonable complaints against any of them, and
    cause all of their violations or neglect of duty to be promptly punished or reported to the
    council for correction." Commonwealth of Pennsylvania Third Class City Code, § 1205.

7.  Defendant Otis Blair is the Commissioner of the City of Chester Police Department, is
    being sued in his official and individual capacities, and whose primary address at all
    relevant times herein was 160 E Seventh Street, Chester, PA 19013, in Delaware County.

8.  As the Commissioner of the Chester Police Department, Defendant Blair served under the
    supervision of Defendant Kirkland, and was specifically responsible for the supervision,
    training, and discipline of all officers and employees of the Chester Police Department.

9.  Defendant James Nolan is the Chief of the City of Chester Police Department, is being
    sued in his official and individual capacities, and whose primary address at all relevant
    times herein was 160 E Seventh Street, Chester, PA 19013, in Delaware County.

10. As Police Chief for the Chester Police Department, Defendant Nolan served under the
    supervision of Defendants Kirkland and Blair, and was directly responsible for the training
    and supervision of all officers and employees of the Chester Police Department.

4

11. Defendant Steven Gretsky is an employee and agent of the City of Chester Police Department, holding the rank of Major, is being sued in his official and individual capacities, and whose primary address at all relevant times herein was 160 E Seventh Street, Chester, PA 19013, in Delaware County.

12. Defendant Marilyn Lee is an employee and agent of the City of Chester Police Department, holding the rank of Captain, and is being sued in her official and individual capacities, and whose primary address at all relevant times herein was 160 E Seventh Street, Chester, PA 19013, in Delaware County.

13. Defendant William Shaw is an employee and agent of the City of Chester Police Department, holding the rank of Captain, and is being sued in his official and individual capacities, whose primary address at all relevant times herein was 160 E Seventh Street, Chester, PA 19013, in Delaware County.

14. Defendant Fraternal Order of Police William Penn Lodge No. 19 ("FOP Lodge 19") is the union for all employees of the City of Chester Police Department, with an official address of P.O. Box 820, Chester, PA 19016, in Delaware County.

15. Defendant Randy Bothwell is a police officer employed by the City of Chester Police Department who also holds the rank of President of FOP Lodge 19. Defendant Bothwell is being sued in his official and individual capacities, and his primary address at all relevant times herein was 160 E Seventh Street, Chester, PA 19013, in Delaware County.

### Jurisdiction

16. Pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), this Court has subject matter jurisdiction, specifically federal question jurisdiction, over Plaintiff Joseph Juisti's claims arising under 42 U.S.C. § 1983 on the basis that the Defendants' actions violated Plaintiff Joseph Juisti's

procedural due process rights to his reputation under the "stigma-plus" doctrine. See Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006).

17. This Court also has federal question jurisdiction over Plaintiff's claims arising under 42 U.S.C. §§ 1985(2) on the basis that Defendants conspired to, and in fact did, retaliate against Mr. Juisti, and attempted to deprive Mr. Juisti of the equal protection of the laws, based on his participation as both a party and as a witness in the filing of a charge of racial discrimination with the EEOC against the City of Chester. See, e.g., Haddle v. Garrison, 525 U.S. 121, 127 (1998).

18. Additionally, Plaintiff's state law claims are properly before this Court pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a), because said claims arise from the same case or controversy as the basis for Plaintiff Joseph Juisti's §§ 1983 and 1985 claims.

19. Personal jurisdiction is appropriately exercised by this Court over all of the parties because, at all relevant times herein, they were either: residents of the Eastern District of Pennsylvania; employees and/or agents of the City of Chester, in Delaware County, Pennsylvania; or a municipal government located in Delaware County, Pennsylvania.

**Venue**

20. Pursuant to 28 U.S.C. § 1391(b)(2), the Eastern District of Pennsylvania is the appropriate venue for this action, because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this venue.

21. Specifically, the events in question all occurred in the Eastern District of Pennsylvania, the overwhelming majority of witnesses and evidence in this matter would be located in the Eastern District of Pennsylvania, and all of the parties are situated in the Eastern District.

6

### Exhaustion of Administrative Remedies

22. As noted *supra*, Plaintiff has filed two charges of discrimination with the EEOC on or about March 21, 2017 and October 1, 2017, on the basis of racial discrimination as to the first charge, and disability discrimination and retaliation as to the second charge, respectively. Those charges are Charge No. 530-2017-02002 and 530-2018-00024. These charges were dual-filed with Pennsylvania Human Rights Commission ("PHRC").

23. On or about May 29, 2018, the EEOC issued Notices of Right to Sue on both charges. Those notices are attached as "Exhibit A."

24. As to the claims being raised in the instant Complaint, to the extent that any of Plaintiffs' claims are subject to an exhaustion requirement by federal law or by state law, including the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa.C.S. § 8501 *et seq.*, Plaintiff has exhausted all administrative remedies by notifying Defendants Otis Blair and FOP Lodge 19 of Plaintiff's intention to file suit via letter on or about December 13, 2017.

25. No Defendant, including the individually-named Defendants and any other agent, officer, or employee of the City of Chester or FOP Lodge 19, responded to Plaintiff's December 13 letter.

### Factual History

26. Plaintiff hereby incorporates each of the foregoing averments by reference as though fully set forth herein.

27. The City of Chester has consistently ranked in statistical reports and analyses as one of the most violent cities in Pennsylvania. According to an analysis of crime rates published in the Delaware County Daily Times in 2017, Chester was the most dangerous city to live in in the Commonwealth of Pennsylvania based on murder rates and violent crime statistics,

7

which included one murder each week for the first two months of 2017.  Rick Kauffman, *Chester Called the Most Dangerous City in Pa.*, DELAWARE COUNTY DAILY TIMES, Mar. 20, 2017, at http://www.delcotimes.com/article/DC/20170320/NEWS/170329974 .

28. The City of Chester, including its police department, has been regularly reported for years as being corrupt, and has been the subject of numerous lawsuits over the years, including over a dozen civil rights lawsuits involving the Chester Police Department in the last two years alone.  See, e.g., Hinds et al., *Pennsylvania City Hopes It's Bouncing Back From the Bottom*, NEW YORK TIMES, Jan. 5, 1992, at

https://www.nytimes.com/1992/01/05/us/pennsylvania-city-hopes-it-s-bouncing-back-from-the-bottom.html (describing deep-rooted problems of crime and corruption in Chester, and corruption investigations of city government); Dana DiFilippo, *Chester Basketball Coach Sues City, Claiming Police Brutality*, WHYY, Nov. 15, 2017, at https://whyy.org/articles/chester-basketball-coach-sues-city-claiming-police-brutality/ .

29. The Spirit, a weekly newspaper based in Chester, recently published an article, citing multiple sources within the Chester Police Department, reporting that the arrest of a Chester police officer for a slew of criminal charges was "just the tip of the iceberg", and that the officer in question was politically "protected", thus his misconduct was well known but went unanswered out of fear of retaliation.  Michel Lee, *Many 'Knew' Protected Chester Cop Was A Problem*, THE CHESTER SPIRIT, Sep. 6, 2017, at http://chesterspirit.com/2017/09/many-knew-protected-chester-cop-was-a-problem/ .

30. The Spirit article also describes racial tensions within the Police Department, and cites multiple sources for the statement that as of 2016, it was "not uncommon" for the City of

Chester, which is predominantly black, to hire and favor African American officers over qualified white officers in an apparent effort to repair the City's long-tarnished image.

31. It is against this backdrop that, in or about April of 2013, Plaintiff Joseph Juisti (who is Caucasian) fulfilled a lifelong dream of pursuing a career in law enforcement when he was hired as a Patrolman, badge number 313, by the City of Chester Police Department.

32. Plaintiff embraced his job with enthusiasm, professionalism, and dedication. However, despite this, Plaintiff quickly clashed with one of his immediate supervisors, Defendant Marilyn Lee.

33. Defendant Lee, who at the time of Plaintiff's hiring by the Chester Police Department was a Sergeant, is now a Captain, and is African American.

34. Practically since he started his employment, Plaintiff consistently and regularly was denied the same opportunities for overtime by Defendant Lee as fellow police officers who happened to be African American. The officers who regularly received opportunities for overtime by Defendant Lee were overwhelmingly African American, and included a relative of Defendant Lee.

35. Other misconduct by Defendant Lee quickly came to Plaintiff's attention. For example, in October of 2013, Plaintiff was dispatched to investigate an allegedly illegal tattoo parlor that was engaged in the tattooing of a juvenile.

36. When Plaintiff responded and interviewed the suspect, the suspect informed Plaintiff that then-Sergeant Lee had called the suspect before police arrived to warn the suspect to get the juvenile out of the building.

9

37. The incident, which amounted to a criminal act, was reported by Plaintiff to his superiors, and was considered serious enough to warrant an internal investigation into Defendant Lee, according to an inter-departmental memorandum dated November 6, 2013.

38. Upon information and belief, Defendant Lee suffered no meaningful repercussions as a result of this serious misconduct reported by Plaintiff. After all, Defendant Lee ultimately was promoted to Captain after this misconduct was reported.

39. Following this incident, Plaintiff suffered a stroke in November 2013, necessitating months of recovery and resulting in vision impairment.

40. As a result of his stroke, Plaintiff received prescription sunglasses that he was instructed by his doctors to wear both indoors and outdoors in order to ameliorate his vision impairment.

41. In July 2014, after Plaintiff returned to work following his stroke, Defendant Lee, after observing Plaintiff's prescription sunglasses, snidely remarked, in full earshot of other officers, "is it sunny in here?", and made an exaggerated gesture towards the ceiling lights. This was despite Plaintiff's prescription, and further despite the fact that other officers, including African American officers, were regularly permitted to wear similar sunglasses indoors.

42. When discussing these and similar incidents that occurred over the years involving Defendant Lee with other officers, Plaintiff was informed that Defendant Lee was politically "protected", and thus, nothing could be done about her conduct towards Plaintiff.

43. Plaintiff also reported Defendant Lee's misconduct to the Police Department's command staff over the years, but regularly received no answers to his reports, and was told on one occasion that "things will happen, just be patient."

44. During the time from his return to duty following his stroke until late 2016, Plaintiff continued to dedicate himself to his duties as a police officer despite Defendant Lee's conduct. In this time, Plaintiff had only received one instance of discipline in the form of a verbal reprimand in February 2016 from Defendant Gretsky over a simple misunderstanding with other officers as to a motor vehicle accident.

45. In the time following his stroke, Plaintiff continued to be relentlessly harassed by Defendant Lee, to the extent that in approximately mid-2015 Defendant Lee even physically and deliberately slammed her shoulder into Plaintiff while he was exiting the elevator. Plaintiff reported this incident to command staff, without results.

46. By late 2016, Defendant Lee continued to favor other officers for overtime, primarily African American officers including a relative, Officer Brownelle Lee, who was also employed at the Police Department.

47. Additionally, by late 2016, at times when Plaintiff was scheduled for overtime, Defendant Lee would go out of her way to cancel Plaintiff's overtime.

48. Not content to allow this conduct to continue unabated, in late 2016 Plaintiff filed grievances with his union, Defendant FOP Lodge 19, each time Defendant Lee interfered with Plaintiff's overtime.

49. These grievances include, but are not necessarily limited to: November 28, 2016, when Defendant Lee offered Plaintiff overtime, and then informed Plaintiff once he arrived that she had assigned the overtime shift to another officer (Defendant Lee's relative), and threatened to write up Plaintiff for speaking with another officer that day about taking his shift; November 29, 2016, when Defendant Lee did not offer an overtime slot to Plaintiff, resulting in Plaintiff missing overtime for the week; December 3, 2016, when Plaintiff yet

11

again was called about working overtime, and then advised that Defendant Lee had
cancelled his overtime, and had given it to her relative; December 4, 2016, when Plaintiff
was afforded twelve hours of overtime, and was sent home by Defendant Lee who stated
she would be working the shift instead due to the absence of prisoners; and March 17,
2017, when Plaintiff was eligible for overtime that day, and was informed by Defendant
Shaw that Defendant Lee had managed all of the overtime calls that day.

50. Defendant FOP Lodge 19 failed to meaningfully respond to these grievances or to
otherwise take steps to ensure that Ms. Lee ceased interfering with Plaintiff's overtime.

51. In or about late 2016 to early 2017, Defendant Lee's targeting of Plaintiff escalated to
regular and systemic harassment, instigated and encouraged among other officers by
Defendant Lee, and in which even other members of the command staff, particularly
Defendant Shaw, participated.

52. Plaintiff would be relentlessly mocked and harassed by officers including Defendants Lee
and Shaw for (including but not limited to), being a "midget", being on steroids, and was
even mocked for having a sibling born with severe mental handicaps and defects that later
resulted in her death.

53. Defendant Shaw in particular encouraged this harassment throughout 2017 on a regular
basis, playing internet videos in front of Plaintiff and other officers of what Defendant
Shaw derisively called "retarded midgets", knowing of Plaintiff's family member and
further knowing this bothered Plaintiff.

54. Plaintiff raised this harassment to the attention of command staff and supervisors including
Defendants Gretsky, Nolan, and Blair, but they did nothing to ameliorate the harassment.

55. Based on Plaintiff's repeated attempts to report the misconduct of Defendant Lee and the harassment instigated and encouraged by Defendants Lee, Shaw, Gretsky, and other officers, Plaintiff was viewed as a "whiner" and troublemaker" by command staff and other members of the Police Department and mocked as such.

56. When Plaintiff asked for an explanation as to why Defendant Lee was allowed to get away with this conduct, Defendant Blair told Plaintiff that Defendant Lee was protected by the Mayor--Defendant Thaddeus Kirkland.

57. In a separate meeting, when posed with the same question by Plaintiff, Defendant Gretsky told Plaintiff that Defendant Lee was protected by Defendant Kirkland because Defendant Kirkland went to the same church as Defendant Lee.

58. Finally, the harassment perpetrated by Defendants Lee and Shaw as well as others, and left unanswered by Defendants Gretsky, Nolan, and Blair, continued to escalate and spread, resulting, by 2017, in Defendant Lee regularly scheduling Plaintiff for the worst shifts, either alone or with rookies Plaintiff was expected to "train", and often in the worst, most dangerous beats.

59. Conversely, Defendant Lee would often give the better shifts to her friends (who were African American) and Officer Brownelle Lee, her relative.

60. When Plaintiff protested this behavior to Defendant Lee, Defendant Lee responded by disciplining Plaintiff in March 2017 for refusing to follow proper procedures and failing to follow her orders.

61. In a memorandum dated March 7, 2017, Defendant Gretsky confirmed the discipline requested by Defendant Lee as to failing to follow proper procedure, despite noting the "history of disputes" between Defendant Lee and Plaintiff, and further despite Defendant

13

Gretsky's specific observation as to Defendant Lee that "at no time should a supervisor abuse their authority over an officer." Despite this, only Plaintiff was charged with an infraction of the Chester Police Department Disciplinary Code. Not Defendant Lee.

62. Left with no other option in the face of utter inaction from both his superiors and from his union, on or about March 21, 2017, Plaintiff filed a Charge of Discrimination with the EEOC for racial discrimination as to Defendant Lee.

63. The City of Chester's Human Resources Department received Plaintiff's Charge of Discrimination on March 27, 2017.

64. Plaintiff was suspended four days later, on March 31, 2017. Plaintiff was suspended without pay for three full days.

65. Plaintiff had no notice whatsoever of his suspension, and found out about the suspension for the first time on March 31, 2017, the same date noted on a "Receipt of Notice of Suspension and Acknowledgement of Responsibilities" form signed by Defendant Blair and dated March 31, 2017, with the effective date of the suspension the same date as the memo, March 31.

66. The ostensible reason for this suspension was for "conduct unbecoming an officer" for a disagreement with Defendant Lee, and was requested by Defendant Lee and recommended by Defendant Gretsky.

67. Plaintiff was then suspended twice more between March 31, 2017 and May 31, 2017, resulting in three suspensions in a two-month span.

68. The second suspension was dated April 24, 2017, signed by Defendant Blair, requested by Defendant Shaw, and recommended by Defendant Gretsky. Again, Plaintiff was informed

14

of his suspension on its effective date, April 24, 2017. The suspension was without pay for five full days.

69. The reason given by Defendant Shaw was that Plaintiff left his beat without permission and without informing anyone of his whereabouts. This is inaccurate—in fact, Plaintiff had requested permission to go to the Delaware County Criminal Investigation Division ("CID") to report the relentless harassment and meritless suspension, and was denied twice by Defendant Shaw, and had reported that he was on his way to CID to request that his harassment be addressed.

70. The third suspension was issued on May 31, 2017 by Defendant Blair, requested by Sergeant El'lan Morgan ("Sergeant Morgan") for allegedly making a false documentation on a prisoner checklist, and recommended by Defendant Gretsky. The suspension was for seven full days without pay.

71. Prior to the suspension, Sergeant Morgan had told Plaintiff that Plaintiff had done nothing wrong.

72. Following the suspension, Sergeant Morgan confided in Plaintiff that she did not want to write up Plaintiff, and was in fact told to discipline Plaintiff by Commissioner Blair and Major Gretsky.

73. During the same incident which formed the basis for Plaintiff's third suspension, another police officer engaged in identical conduct, and also committed a worse infraction by failing to strip search a prisoner, resulting in a cell phone being smuggled into the cell block. Yet that officer only received a verbal reprimand where Plaintiff was suspended for the third time in two months.

74. These meritless and retaliatory suspensions were only issued after Plaintiff filed his first EEOC complaint.  Plaintiff filed a grievance with Defendant FOP Lodge 19 for each suspension.

75. None of these grievances were ever addressed by Defendant FOP Lodge 19.  Each time these suspensions came up for discussion during union meetings, they were tabled by Defendant Randy Bothwell, President of FOP Lodge 19.

76. Other times, when the issue of Plaintiff's suspensions and harassments came up during conversations, Defendant Bothwell would immediately stop the conversation and say "we have other things to discuss."  Despite this, Defendant Bothwell specifically instructed other members of the union board to document each and every conversation and interaction they had with Plaintiff.

77. During a separate meeting with Defendant Blair and Plaintiff in mid-2017, Defendant Bothwell specifically remarked that the union (meaning Defendant FOP Lodge 19) did not have to do anything to address Plaintiff's suspensions or grievances, because Plaintiff had retained an attorney.

78. Throughout this period in 2017 of harassment and retaliatory suspensions, Defendant Lee continued to interfere with or take away Plaintiff's overtime.  Plaintiff filed additional grievances based on this, including but not limited to grievances filed on June 19, 2017; October 6, 2017; December 25, 2017; and December 26, 2017.

79. As with all of the other grievances, none of these were meaningfully addressed by Defendant FOP Lodge 19.

80. The seemingly endless harassment, coupled with the meritless suspensions as well as the deafening silence from the union and the supervisors who were supposed to help him, took

a severe toll on Plaintiff, who by early to mid-2017 was suffering extreme mental anguish and emotional distress in the form of crippling anxiety, depression, loss of sleep, panic attacks, and loss of life's pleasures.

81. As a police officer in the deadliest city in Pennsylvania, Plaintiff felt like he was all alone and could trust no one, left helpless by the men and women who were supposed to watch his back, and who were ostracizing, torturing, and punishing Plaintiff simply for trying to do his job.

82. The harassment Plaintiff continued to suffer throughout 2017 did not stop with the above-mentioned conduct. In fact, the harassment continued to escalate, particularly after the April suspension, with higher-level officials, including Defendant Shaw, Defendant Gretsky and Defendant Blair, becoming involved in the targeted harassment and retaliation against Plaintiff as well.

83. On April 23, 2017, Defendant Shaw--who by this point had been regularly engaging in harassment of Plaintiff through mocking him as a "midget", "retarded", and an abuser of steroids--approached Plaintiff from behind and viciously pinched Plaintiff's arm, causing Plaintiff to sustain severe bruising and pain and discomfort when wearing his bullet-proof vest.

84. When Plaintiff raised Defendant Shaw's assault and other harassment to the attention of Defendant Gretsky and Defendant Blair, neither Defendant took any meaningful action, and Defendant Blair even remarked that the assault was Plaintiff's fault and that Plaintiff should stop "fooling around" with Defendant Shaw.

17

85. During a separate incident in November 2017, when Plaintiff protested this harassment to Defendant Shaw, Defendant Shaw responded: "oh well, would you please leave then, go somewhere else or wait until you have enough time and retire."

86. Defendant Lee continued to antagonize and harass Plaintiff even more following the suspension, and began re-examining cases on which Plaintiff worked to look for mistakes.

87. Finally, Defendant Lee continued engaging in blatant misconduct, such as in August 2017 when, much like during the 2013 tattooing incident, Defendant Lee notified a suspect in advance that police were coming before Plaintiff arrived.

88. During this August incident, Defendant Lee also arrived on scene and attempted to let the suspect--a former police officer and friend of Defendant Lee's--go without being arrested, and even ordered Plaintiff to drive the suspect home in the suspect's private vehicle.

89. Finally, Defendant Lee also continued to assign Plaintiff undesirable shifts, and even began sending Plaintiff on dangerous calls without backup, blatantly and recklessly endangering his life and safety.

90. Plaintiff continued to raise all of these issues to the command staff's attention. Not only was no action taken, nor did Defendant Lee receive any repercussions for her actions, but other officers in the department began encouraging and fomenting altercations between Plaintiff and Defendant Lee whenever possible.

91. None of the individually named Defendants, including Defendants Gretsky, Nolan, and Blair, did anything to ameliorate the constant harassment suffered by Plaintiff.

92. Defendant Gretsky, in mid to late 2017, following Plaintiff's suspensions, also began reopening and reinvestigating Plaintiff's old cases, without merit.

18

93. Defendant Shaw took Plaintiff off of "early car" shift by late 2017. "Early car" was one of the more desirable and peaceful shifts. Plaintiff felt he was being punished by Defendant Shaw for reporting the harassment and assault by Defendant Shaw and for filing the EEOC complaints.

94. Finally, the Commissioner of Police, Defendant Otis Blair, also began directly targeting and harassing Plaintiff, particularly after Plaintiff filed the first EEOC complaint.

95. Despite being the Commissioner of the entire Chester Police Department, Defendant Blair began taking a keen interest in Plaintiff after the first EEOC complaint was filed, and began personally responding to and inspecting calls to which Plaintiff was assigned.

96. Defendant Blair would regularly issue orders to Plaintiff on these calls that either were not supported by the facts or were against standard protocol, and when Plaintiff began to protest, Defendant Blair forced him to do so anyway.

97. On May 2, 2017--after the second suspension, and before the third suspension--Defendant Blair called Plaintiff to the Commissioner's office for a meeting in which Defendant Blair, Defendant Nolan, Defendant Gretsky, and another officer were present.

98. In this meeting, Defendant Blair told Plaintiff: "I have been told by two sources that you have been talking about me and stated I should watch my back." This was completely untrue.

99. When Plaintiff stated he never made such comments, Defendant Blair pressed the issue, said that he had "reliable" sources, and told Plaintiff to "knock it off."

100. When Plaintiff responded that he would like his lawyer present for any further meetings like this, Defendant Blair responded: "I don't care."

101. On May 4, 2017, Plaintiff had another encounter with Defendant Blair, who told Plaintiff "I'm going to kill you", because Plaintiff "wrecked" a patrol car as a result of a successful high-speed pursuit that resulted in four arrests.

102. During this same encounter, Defendant Blair further told Plaintiff that Plaintiff was illegally parked, despite Plaintiff parking his car in a commonly-used spot by officers who were transporting prisoners. To the best of Plaintiff's knowledge, no other officer had ever been reprimanded by the police commissioner for such conduct.

103. In July 2017, Plaintiff was the subject of a citizen complaint filed by one Curtis Davis, an individual whom Plaintiff arrested. Plaintiff was investigated as a result of the citizen complaint, which was ultimately withdrawn by Davis several days later.

104. Months later, on January 27, 2018, Davis revealed, in a sworn affidavit filed in connection with his criminal matter stemming from the July arrest, that Davis encountered Defendant Blair shortly after his arrest in the elevator.

105. According to Davis' sworn affidavit (which was also signed by Davis' defense attorney), Defendant Blair, when he was told by Davis that the arresting officer was Plaintiff, specifically instructed Davis to file a citizen complaint against Plaintiff.

106. On August 21, 2017, Plaintiff was advised to give Defendant Blair a call. When Plaintiff contacted Defendant Blair, Defendant Blair told Plaintiff that Defendant Blair had observed Plaintiff wearing sunglasses inside, and told Plaintiff that Plaintiff could not wear them.

107. These were the very same prescription glasses that Plaintiff had to wear as a result of his 2013 stroke.

108. When Plaintiff told Defendant Blair this, Defendant Blair disregarded Plaintiff's disability, stated that the color (the sunglasses had a white frame) was inappropriate, and

told Plaintiff that Plaintiff needed to stop wearing them because they made Plaintiff "look like the Terminator."

109. Multiple other officers, particularly African American officers, regularly wore sunglasses (without prescriptions) of various colors and of the same kind as Plaintiff, without any sort of repercussions whatsoever, let alone a specific reprimand from the Commissioner of Police.

110. There is no Chester Police or City of Chester policy preventing or prohibiting these types of sunglasses, let alone prescription sunglasses to aid with vision impairment resulting from a stroke.

111. As a result of the sunglasses incident with Defendant Blair, as well as the near-constant retaliation Plaintiff was suffering, Plaintiff filed a second EEOC complaint in October of 2017.

112. The aforementioned harassment and retaliation continued into early 2018. On January 11, 2018, Plaintiff discovered that someone had accessed his patrol vehicle and vandalized his hat that was left therein by writing "douche bag" on it in what appears to be chalk.

113. These incidents and the overall systemic pattern of harassment, which escalated after the first EEOC complaint was filed and the retaliatory suspensions began, resulted in Plaintiff not feeling safe at work, and has severely and intimately affected every aspect of Plaintiff's life to the extent that he no longer feels that he can work in law enforcement.

114. In January 2018, Plaintiff felt constructively discharged due to the foregoing conduct, and has taken leave from work.

115. Plaintiff has seen several medical professionals, who have diagnosed Plaintiff as suffering from extreme anxiety, depression, and post-traumatic stress disorder as a result of the foregoing conduct.

116. Plaintiff submitted a claim for workers compensation with the City of Chester, which was denied by Defendants' insurance carrier. As of this filing, Plaintiff is preparing to file an appeal of the denial of workers compensation benefits.

117. Finally, it should be noted that in addition to all of the foregoing individuals to whom Plaintiff reported the harassment and retaliation, there was one other individual who Plaintiff met with: Defendant Thaddeus Kirkland, Mayor of Chester.

118. Plaintiff met with Defendant Kirkland twice in 2017, including on or about May 3, 2017.

119. During these meetings, particularly the May 3 meeting, Plaintiff raised all of the issues he had experienced to Defendant Kirkland's attention: the initial harassment by Defendant Lee, the subsequent harassment by Defendant Shaw, the two suspensions and other retaliation by Defendants Gretsky and Blair, and the complete inaction by Defendants Nolan, Bothwell, and FOP Lodge 19.

120. Defendant Kirkland specifically told Plaintiff that he "appreciated" Plaintiff raising these issues to his attention.

121. Defendant Kirkland also told Plaintiff during the May 3 meeting to "not worry about any more suspensions", and promised Plaintiff that there would be no such suspensions going forward, stating that this was because "they will all go through me."

122. Approximately two to three weeks after Defendant Kirkland made this promise, Plaintiff was suspended for the third time.

123. In addition to the foregoing items of damages discussed *supra*, Plaintiff has also suffered loss to his reputation in the form of questioning as to what happened to him from various people with whom he worked and dealt with as a police officer, as well as pointed shunning and ostracization from his former colleagues.

124. Throughout the above-averred course of events, Plaintiff made no effort to hide his EEOC filings, which were specifically known of and mentioned by Defendants Kirkland, Blair, Nolan, Gretsky, Lee, Shaw, and Bothwell on multiple occasions.

125. The fact of Plaintiff's EEOC filings was also well known by multiple other members of the Chester Police Department and FOP Lodge 19.

126. Despite the Defendants' actual and constructive knowledge of the EEOC filings, the Defendants never deigned to respond to either EEOC charge of discrimination until April 11, 2018--over one year after the first EEOC complaint was filed--when Plaintiff inquired as to the status of the EEOC investigation from the local EEOC office, and was informed that, for the first time, counsel for the City of Chester reached out to the EEOC, despite numerous efforts at communication and investigation in the past that went unanswered.

127. On May 11, 2018--one month after Defendants finally acknowledged the existence of the EEOC complaints to the EEOC--Defendants filed belated responses to Plaintiff's charges of discrimination in both EEOC cases. By this point, over 180 days had passed for both EEOC matters, and Plaintiff lawfully requested notices of right to sue.

128. The stated reason for the late response by Defendants was that the City of Chester had no knowledge until April 11, 2018 of the existence of the EEOC complaints due to some sort of alleged internal error.

129. However, this stated reason is undermined and contradicted by numerous actions and statements by the Defendants acknowledging the existence of the EEOC complaints, as already pleaded at length *supra*, and as indicated by other instances, such as a comment by Defendant Nolan to Chester police officer that Plaintiff "filed two EEOC complaints that he thinks he is going to win."

## COUNT I--VIOLATION OF TITLE VII --REVERSE RACE DISCRIMINATION

*By Plaintiff against Defendants City of Chester, Otis Blair and Marilyn Lee in their official and individual capacities*

130. Plaintiff hereby incorporates each of the foregoing averments by reference as though fully set forth herein.

131. Plaintiff was consistently discriminated against by his immediate supervisor, Defendant Marilyn Lee, and his overall supervisor, Defendant Otis Blair, on the basis of his race.

132. The Chester Police Department, and the City of Chester overall, is predominantly black. As reported by The Spirit (referenced *supra*), by 2017, the leadership of the city was predominantly African American and was, according to sources, favoring African American officers over white officers.

133. Despite his experience and qualifications, Plaintiff was regularly undermined and meritlessly disciplined by his supervisors, Defendant Lee and Defendant Blair, despite like-positioned African American officers not being treated in the same fashion.

134. Defendant Lee would regularly give opportunities such as shifts and overtime to African American officers, and not to Plaintiff, despite Plaintiff's repeated requests.

24

135.  As a result of this reverse race discrimination, Plaintiff suffered an adverse employment action in the form of meritless discipline and a severe and pervasive hostile work environment that resulted in Plaintiff's constructive discharge.

136.  The reasons offered by Defendants Blair and Lee for the disparate treatment suffered by Plaintiff is mere pretext, as inferred from the myriad of conduct described *supra* and by the fact that no other officer, particularly African American officer, was treated like Plaintiff for the same or similar conduct.

137.  As a result of the discrimination carried out by Defendants Blair and Lee, Plaintiff has suffered damages in excess of $150,000 in an exact amount to be determined at trial.

138.  These damages include, but are not limited to, compensatory damages for Plaintiff's pain and suffering, mental anguish, emotional distress, loss of life's pleasures, lost wages, lost overtime, back pay, front pay, loss of reputation, loss of promotional opportunity, and loss of benefits.

139.  These damages also include reasonable attorney's fees and costs under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq.

140.  These damages also include punitive damages, based on the outrageous, wanton, and malicious nature of Defendants' conduct.

WHEREFORE, Plaintiff Joseph Juisti respectfully requests that this Honorable Court find in favor of Plaintiff and against Defendants City of Chester, Otis Blair, and Marilyn Lee in their official and individual capacities, and award compensatory damages in excess of $150,000, punitive damages, reasonable attorney's fees, costs, and any other relief this Honorable Court deems necessary, fair, and appropriate in exact amounts to be determined by trial.

## COUNT II--VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990

*By Plaintiff against Defendants City of Chester and Otis Blair*

141. Plaintiff hereby incorporates each of the foregoing averments by reference as though fully set forth herein.

142. Plaintiff has an actual disability that substantially limited his major life activities in the form of vision impairment resulting from his 2013 stroke.

143. As a result of his stroke-related vision impairment, Plaintiff was specifically instructed by his doctors to wear prescription sunglasses.

144. Defendant Blair was informed of this, yet Defendant Blair, acting as Plaintiff's supervisor, forced Plaintiff to remove his prescription sunglasses and was no longer allowed to wear them to work.

145. Plaintiff was specifically targeted by Defendant Blair because of his disability, and like-positioned officers who wore similar types of sunglasses, which were not prescribed nor related to any disability, were not prevented from wearing said glasses.

146. Defendant Blair failed to provide, and refused to provide, a reasonable accommodation to Plaintiff for his disability.

147. Based on Defendant Blair's conduct, Plaintiff has suffered damages in the form of compensatory damages, including damages for Plaintiff's pain and suffering, mental anguish, emotional distress, loss of life's pleasures, lost wages, lost overtime, back pay, front pay, loss of reputation, loss of promotional opportunity, and loss of benefits, totaling in excess of $150,000, in an exact amount to be determined at trial, as well as punitive damages based on the outrageous and malicious nature of Defendant Blair's conduct, reasonable attorney's fees, and costs

26

WHEREFORE, Plaintiff Joseph Juisti requests that this Honorable Court find in favor of Plaintiff and against Defendants City of Chester and Otis Blair, in his official and individual capacities, and award Plaintiff compensatory damages, punitive damages, attorney's fees, costs, and any other relief this Honorable Court deems necessary, fair, and appropriate, in exact amounts to be determined at trial.

## COUNT III--RETALIATION UNDER TITLE VII AND THE AMERICANS WITH DISABILITIES ACT

*By Plaintiff as to Defendants Thaddeus Kirkland, Otis Blair, James Nolan, Steven Gretsky, Marilyn Lee, and William Shaw, in their official and individual capacities*

148. Plaintiff hereby incorporates each of the foregoing averments by reference as though fully set forth herein.

149. Plaintiff filed his first EEOC complaint (pertaining to Count I of the instant Complaint) on March 21, 2017, and served the EEOC complaint on the City of Chester on March 27, 2017.

150. Four days later, on March 31, 2017, Plaintiff was suspended for the first time in his career by Defendants Blair, Gretsky, and Lee on the basis of mere pretext, pretext that in Plaintiff's years on the force had never been, to the best of Plaintiff's knowledge, information, and belief, the basis for a suspension for any other officer.

151. When Plaintiff went to CID to report this retaliatory suspension and the other ongoing harassment he had been suffering throughout the year, he was suspended for the second time on April 24, 2017, by Defendants Blair, Gretsky, and Shaw, in blatant retaliation.

152. The basis for the second suspension--Plaintiff leaving his post--was false and obvious pretext by Defendant Shaw, who had specifically denied without reason Plaintiff's two

prior requests to go to CID to report the harassment and misconduct he had witnessed and experienced, and had followed protocol when he went to CID that day.

153. Plaintiff met with Defendant Kirkland twice to discuss his harassment and meritless discipline, including on May 3, 2017, after the second suspension.

154. During the May 3 meeting, Defendant Kirkland promised he would help Plaintiff and stated that suspensions would be handled solely through him going forward.

155. Only a few weeks later, Plaintiff was suspended a third time, by Sergeant Morgan, who admitted to Plaintiff that she did not feel there was a basis for the suspension, and further confessed that she was forced to do so by Defendants Blair and Gretsky.

156. Following Plaintiff's filing of the first EEOC complaint, in addition to the foregoing pretextual discipline, the harassment and disparate treatment he suffered continued to escalate, such as: Defendant Lee endangering Plaintiff's life and safety by placing him on dangerous assignments without backup; Defendant Shaw relentlessly harassing Plaintiff for being "on steroids", "a midget", and "retarded", and physically assaulting Plaintiff without provocation; Defendants Gretsky, Lee, and Blair baselessly micromanaging Plaintiff and reinvestigating his previous cases; Defendant Blair threatening Plaintiff in a meeting on the basis of a nonexistent and false threat Defendant Blair claimed Plaintiff made; Defendant Blair threatening to kill Plaintiff for wrecking a vehicle; Defendant Blair telling Plaintiff he "didn't care" that Plaintiff wanted a lawyer for future meetings; Defendant Lee denying Plaintiff the overtime he was entitled to and reasonably expected even after he previously filed grievances against her for such conduct, and particularly after the two EEOC complaints were filed; Defendant Blair encouraging a suspect to file a citizen complaint against Plaintiff; and Defendants Nolan and Kirkland, despite being put on specific notice

28

of this constant harassment and misconduct, doing nothing, and fostering an environment where such retaliatory harassment could occur. Each of the foregoing Defendants are supervisors of Plaintiff.

157. As a result of the foregoing retaliatory harassment carried out by the above-named Defendants, Plaintiff has suffered compensatory damages in excess of $150,000.

158. These damages include, but are not limited to, compensatory damages for Plaintiff's pain and suffering, mental anguish, emotional distress, loss of life's pleasures, lost wages, lost overtime, back pay, front pay, loss of reputation, loss of promotional opportunity, and loss of benefits.

159. Plaintiff has also suffered punitive damages, based on the outrageous and malicious nature of the Defendants' conduct, in an exact amount to be determined at trial.

160. Plaintiff also requests reasonable attorney's fees and costs, as well as any other relief deemed appropriate by this Court.

WHEREFORE, Plaintiff Joseph Juisti respectfully requests that this Honorable Court find in favor of Plaintiff and against Defendants City of Chester, Thaddeus Kirkland, Otis Blair, James Nolan, Steven Gretsky, Marilyn Lee, and William Shaw, in their official and individual capacities, and award Plaintiff compensatory damages, punitive damages, reasonable attorney's fees, costs, and any other relief this Honorable Court deems necessary, fair, and appropriate, in excess of $150,000, in exact amounts to be determined at trial.

## COUNT IV: VIOLATION OF 42 U.S.C. § 1983

*By Plaintiff as to Defendants Thaddeus Kirkland, Otis Blair, James Nolan, Steven Gretsky, Marilyn Lee, William Shaw, and Randy Bothwell, in their official and individual capacities*

161. Plaintiff hereby incorporates each of the foregoing averments by reference as though fully set forth herein.

162. Federal courts have recognized that when a plaintiff's government employment is terminated, even where that employment is at-will, and even when such termination comes in the form of constructive discharge, and the plaintiff is defamed over the course of being terminated or constructively discharged, the plaintiff's procedural due process rights may have been violated under the "stigma-plus" test. Hill v. Borough of Kutztown, 455 F.3d 225, 238 (3d Cir. 2006); Paterno v. Pennsylvania State Univ., 149 F.Supp.3d 530, 541 (E.D. Pa. 2016) (summarizing stigma-plus claims under procedural due process) (internal citations omitted).

163. When a plaintiff is deprived of his constitutional rights by a government official under color of state law, the plaintiff has a cause of action under 42 U.S.C. § 1983 against that individual who acted unconstitutionally.

164. Additionally, supervisors of government actors who have violated § 1983 can also be liable under that statute for the deprivation of a plaintiff's rights, when those supervisors have actually knowledge of the unconstitutional conduct of their subordinates, and acquiesce to such conduct. See, e.g., McKenna v. City of Philadelphia, 582 F.3d 447, 460-61 (3d Cir. 2009).

165. Finally, individuals can be liable under § 1983 by conspiring with government actors who, acting under color of state law, in fact deprive plaintiffs of constitutionally protected rights. See Dennis v. Sparks, 449 U.S. 24, 27-28 (1980) (citing Adickes v. S.H. Kress & 22 Co., 398 U.S. 144, 152 (1970)).

166. Based on the foregoing, Defendants Blair, Gretsky, Lee, and Shaw each acted individually to deprive Plaintiff of his procedural due process rights under the stigma plus doctrine, by relentlessly disciplining, undermining, investigating, and harassing Plaintiff to such an extent that Plaintiff was constructively discharged. This includes the three suspensions from March through May of 2017, each of which Plaintiff had *no* notice of until the effective date of the suspension.

167. As a result of this constructive discharge, Plaintiff has suffered loss of reputation, plus loss of income resulting from his repeated suspensions and constructive discharge, plus physical and mental harm in the form of his extreme anxiety, depression, and post-traumatic stress disorder resulting from the campaign of harassment and retaliation carried out by the Defendants.

168. Defendants Blair, Gretsky, Lee, and Shaw are liable under § 1983 not only for their own actions, but as co-conspirators with one another.

169. Defendants Kirkland and Nolan are liable under § 1983 for the actions of their subordinates because, as supervisors, Defendants Kirkland and Nolan were specifically informed by Plaintiff more than once of the harassment and unconstitutional conduct of the Defendants, and Defendants Kirkland and Nolan acquiesced in their deprivation of Plaintiff's rights.

170. Defendants Kirkland and Nolan are also liable under § 1983 as co-conspirators of the other Defendants.

171. Finally, Defendant Bothwell, as the president of Plaintiff's union, was on specific notice by Plaintiff via multiple unanswered grievances of the unconstitutional conduct by the

foregoing Defendants, was even present during at least one meeting with some of these Defendants to address this harassment, and refused to take action.

172. Defendant Bothwell is likewise liable under § 1983 as a co-conspirator with the aforementioned Defendants.

173. The existence of said conspiracy, including the agreement by the Defendants to target Plaintiff and violate his procedural due process rights and acts in furtherance of said conspiracy, are fairly inferred from the averments set forth at great length *supra*.

174. Based on the Defendants' violations of § 1983, Plaintiff respectfully requests compensatory damages in excess of $150,000, in exact amounts to be determined at trial.

175. Plaintiff also requests punitive damages against each of the foregoing Defendants in their individual capacities, based on the outrageous and malicious nature of their actions.

176. Finally, pursuant to 42 U.S.C. § 1988(b), Plaintiff requests reasonable attorney's fees and costs incurred in bringing and litigating this action.

WHEREFORE, Plaintiff Joseph Juisti respectfully requests that this Honorable Court find for Plaintiff and against Defendants Thaddeus Kirkland, Otis Blair, James Nolan, Steven Gretsky, Marilyn Lee, William Shaw, and Randy Bothwell, in their official and individual capacities, and award Plaintiff compensatory damages, punitive damages, reasonable attorney's fees, costs, and any other relief this Honorable Court deems necessary, fair, and appropriate, in excess of $150,000 and in exact amounts to be determined at trial.

## COUNT V: VIOLATION OF 42 U.S.C. § 1983

*As to Defendant City of Chester*

177. Plaintiff hereby incorporates each of the foregoing averments by reference as though fully set forth herein.

178. Under the <u>Monell</u> doctrine, as articulated by the United States Supreme Court in <u>Monell</u> <u>v. Dept. of Soc. Sec. of City of New York</u>, 436 U.S. 658, 690 (1978), municipalities can be liable under § 1983 for maintaining a custom, policy, or practice that results in deprivation of a plaintiff's constitutional rights, or for failure to adequately train and supervise its employees that results in constitutional violations.

179. The Chester Police Department is a division of Defendant City of Chester.

180. Accordingly, under the <u>Monell</u> doctrine, Defendant City of Chester is liable for any custom, policy, or practice, including failure to adequately train and supervise its police officers and police command staff, that results in the deprivation of Plaintiff's constitutional rights.

181. The discriminatory custom, policy and practice forming the basis for Plaintiff's employment discrimination claims and § 1983 claims against the individually named Defendants is evident from the averments pleaded *supra*--that Defendant City of Chester tolerated and encouraged a racially discriminatory atmosphere meant to protect the political elite of the City of Chester's leadership--such as Defendants Kirkland, Lee, and Blair--at the expense of others.

182. Said custom, policy, and practice has long been recognized by local news outlets, as pleaded *supra* in ¶¶ 27 through 30. This includes The Spirit, which reported late last year that the arrest of an officer who was a friend of the City of Chester's political leadership was just "the tip of the iceberg", and that a toxic atmosphere of political protection and fear of retaliation was rampant in the police department.

183. The relentless harassment and blatant retaliation suffered by Plaintiff is further indicative of a failure by the City of Chester to adequately train its police officers and police command staff.

184. Based on the foregoing, Defendant City of Chester is liable under § 1983 pursuant to the Monell doctrine.

185. Plaintiff has suffered compensatory damages as a result of this unconstitutional custom, policy, practice, and failure to train, in excess of $150,000, in an exact amount to be determined at trial.

186. Plaintiff also requests reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988(b).

WHEREFORE, Plaintiff Joseph Juisti respectfully requests that this Honorable Court find in favor of Plaintiff and against Defendant City of Chester, and award Plaintiff compensatory damages, reasonable attorney's fees, costs, and any other relief this Honorable Court deems necessary, fair, and appropriate, in excess of $150,000, in exact amounts to be determined at trial.

## COUNT VI: VIOLATION OF 42 U.S.C. § 1985(2)

*By Plaintiff as to Defendants Thaddeus Kirkland, Otis Blair, James Nolan, Steven Gretsky, Marilyn Lee, William Shaw, and Randy Bothwell, in their official and individual capacities*

187. Plaintiff hereby incorporates each of the foregoing by reference as though fully set forth herein.

188. 42 U.S.C. § 1985(2) states:

[i]f two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such

court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

189. Pursuant to the foregoing statute, the above-named individual Defendants conspired to injure Plaintiff in his property (his compensation as a police officer) through deterrence, intimidation, and retaliation as punishment for Plaintiff's filing of the EEOC complaints and his participation in the EEOC matters as a party and as a witness.

190. This conspiracy is fairly inferred by the averments set forth at great length *supra*, including the escalating harassment following Plaintiff's EEOC filings, Defendant Blair's solicitation of a citizen complaint against Plaintiff, and the three suspensions carried out by Defendants, the first of which was four days after the City of Chester received notice of the EEOC filing, the second of which was for Plaintiff's attempt to report the harassment and retaliation to CID, and the third of which was mere weeks after Plaintiff met with Defendant Kirkland to discuss the harassment and retaliation.

191. Defendants likewise conspired to impede, hinder, obstruct, and defeat the due course of justice with the intent to deny Plaintiff the equal protection of the laws in connection with his racial discrimination and retaliation claims, as fairly inferred from the foregoing averments, and as further illustrated by the Defendants' intentional delay in failing to respond to the EEOC complaints.

192. As a direct and proximate result of the Defendants' unlawful conspiracy, Plaintiff suffered compensatory damages in excess of $150,00, in an exact amount to be determined at trial.

193. Based on the outrageous and malicious nature of the Defendants' actions, Plaintiff requests that punitive damages be imposed against the Defendants in their individual capacities.

194. Pursuant to 42 U.S.C. § 1988(b), Plaintiff also requests reasonable attorney's fees and costs incurred in the bringing and litigating of this action.

WHEREFORE, Plaintiff Joseph Juisti respectfully requests that this Honorable Court find for Plaintiff and against Defendants Thaddeus Kirkland, Otis Blair, James Nolan, Steven Gretsky, Marilyn Lee, William Shaw, and Randy Bothwell, in their official and individual capacities, and award Plaintiff compensatory damages, punitive damages, reasonable attorney's fees, costs, and any other relief this Honorable Court deems necessary, fair, and appropriate, in excess of $150,000 and in exact amounts to be determined at trial.

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*By Plaintiff as to Defendants Thaddeus Kirkland, Otis Blair, James Nolan, Steven Gretsky, Marilyn Lee, William Shaw, and Randy Bothwell, in their official and individual capacities*

195. Plaintiff hereby incorporates each of the foregoing averments by reference as though fully set forth herein.

196. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over any state claims that arise from the same case or controversy as the matters that fall within this Court's subject matter jurisdiction.

197. Pennsylvania courts have recognized a cause of action for intentional infliction of emotional distress when the defendant acts intentionally or recklessly, the acts were extreme and outrageous, and the plaintiff suffered severe emotional distress a result of this conduct. See Johnson v. Caparelli, 425 Pa. Super. 404, 625 A.2d 668 (1993).

198. Based on the foregoing averments set forth at length *supra*, each of the above-named Defendants acted intentionally or recklessly to carry out extreme and outrageous harassment and retaliation against Plaintiff.

199. Plaintiff suffered severe emotional distress as a result of this extreme and outrageous conduct in the form of diagnosed extreme anxiety, depression, and post-traumatic stress disorder that became so debilitating that Plaintiff was constructively discharged and could no longer work in the law enforcement field.

200. Based on the foregoing, Plaintiff respectfully requests compensatory damages in excess of $150,000, in an exact amount to be determined at trial, as well as punitive damages based on the outrageous and malicious nature of the Defendants' actions.

WHEREFORE, Plaintiff Joseph Juisti respectfully requests that this Honorable Court find for Plaintiff and against Defendants Thaddeus Kirkland, Otis Blair, James Nolan, Steven Gretsky, Marilyn Lee, William Shaw, and Randy Bothwell, in their official and individual capacities, and award Plaintiff compensatory damages and punitive damages, and any other relief this Honorable Court deems necessary, fair, and appropriate, in excess of $150,000 and in exact amounts to be determined at trial.

## COUNT VIII: BREACH OF THE DUTY OF FAIR REPRESENTATION

*As to Defendants FOP Lodge 19 and Randy Bothwell, in his official and individual capacities*

201. Plaintiff hereby incorporates each of the foregoing by reference as though fully set forth herein.

202. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over any state claims that arise from the same case or controversy as the matters that fall within this Court's subject matter jurisdiction.

203. Pennsylvania recognizes two distinct causes of action for breach of the duty of fair representation against an employee's union: one is for individual failures of a collective bargaining agent for isolated instances of failing to file grievances, which fall within Pennsylvania's Public Employee Relations Act and is subject to a four-month statute of limitations. See Casner v. AFSCME, 658 A.2d 865, 869 (Pa. Cmwlth. 1995) (citing Ziccardi v. Pennsylvania, 456 A.2d 979 (Pa. 1982)).

204. The other recognized cause of action for breach of duty to fair representation is implicated when a union unfairly represents an employee by refusing to submit grievances due to arbitrariness, discrimination, or bad faith; such refusal is akin to breach of fiduciary duty, and is subject to a two-year statute of limitations. Casner, 658 A.2d at 870 (citing PLRB v. Eastern Lancaster Cnty. Education Assoc., 427 A.2d 305 (1981)).

205. The latter cause of action for breach of the duty of fair representation applies in this case as to Defendant FOP Lodge 19 and Defendant Bothwell, as president of FOP Lodge 19.

206. Since late 2016, Plaintiff has filed a myriad of grievances against Defendant Lee for her repeated harassment, misconduct, and refusal to honor Plaintiff's overtime.

207. Plaintiff also filed grievances for each of the three meritless suspensions he received in 2017 after he filed his first EEOC complaint.

208. None of these grievances ever went to arbitration. Instead, Defendant Bothwell arbitrarily and continuously refused to address each and every grievance filed by Plaintiff, tabling these grievances during union meetings and refusing to discuss them when they came up in conversation.

209. Defendant Bothwell's bad faith is further evidenced by his comment during a meeting with Plaintiff and Defendant Blair during which Defendant Bothwell indicated the union

would not be addressing Plaintiff's grievances at all because Plaintiff had retained an
attorney.

210. The complete and utter failure of Defendants Bothwell and FOP Lodge 19 to address any
of Plaintiff's grievances is arbitrary and in bad faith.

211. As a result of this breach of the duty of fair representation, Plaintiff has suffered
compensatory damages in excess of $150,000, in an exact amount to be determined at trial.

212. Based on the malicious and outrageous nature of Defendant Bothwell's actions, Plaintiff
requests punitive damages, in an exact amount to be determined at trial.

WHEREFORE, Plaintiff Joseph Juisti respectfully requests that this Honorable Court find in
favor of Plaintiff and against Defendants FOP Lodge 19 and Randy Bothwell, in his individual
and official capacities, and award Plaintiff compensatory damages, punitive damages, and any
other relief this Honorable Court deems necessary, fair, and appropriate.

## COUNT IX: CIVIL CONSPIRACY

*By Plaintiff as to Defendants Thaddeus Kirkland, Otis Blair, James Nolan, Steven Gretsky,*
*Marilyn Lee, William Shaw, and Randy Bothwell, in their official and individual capacities*

213. Plaintiff hereby incorporates each of the foregoing by reference as though fully set forth
herein.

214. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over any state
claims that arise from the same case or controversy as the matters that fall within this
Court's subject matter jurisdiction.

215. Based on the foregoing, and as pleaded at length in this Complaint, under Pennsylvania's
common law cause of action for civil conspiracy, the individually named Defendants

agreed to target Plaintiff for harassment and for retaliation for Plaintiff's reporting of the harassment to EEOC.

216. Based on the civil conspiracy by the individually named Defendants, Plaintiff suffered compensatory damages in excess of $150,000 in the form of emotional distress, pain and suffering, mental anguish, and loss of life's pleasures.

217. Based on the malicious and wanton nature of Defendants' actions, Plaintiff requests punitive damages in an exact amount to be determined at trial.

WHEREFORE, Plaintiff Joseph Juisti respectfully requests that this Honorable Court find for Plaintiff and against Defendants Thaddeus Kirkland, Otis Blair, James Nolan, Steven Gretsky, Marilyn Lee, William Shaw, and Randy Bothwell, in their official and individual capacities, and award Plaintiff compensatory damages and punitive damages, and any other relief this Honorable Court deems necessary, fair, and appropriate, in excess of $150,000 and in exact amounts to be determined at trial.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiff Joseph Juisti prays for the following relief against the above-captioned Defendants:

(1)     Compensatory damages, in excess of $150,000, in an exact amount to be determined at trial, as to all Defendants;

(2)     Punitive damages, in an exact amount to be determined at trial, as to the individually named Defendants in their individual capacities;

(3)     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, as to all Defendants;

(4)    Interest and any other relief this Honorable Court deems necessary, fair, and

appropriate.

Respectfully Submitted,

Gerard P. Egan, Esq. (20744)
Brian L. McCarthy, Esq. (319722)
Egan & McCarthy, Attorneys at Law
657 Exton Commons
Exton, PA 19341
610-567-3436

Date: 05/31/18

41

## VERIFICATION

I, Joseph Juisti, hereby verify that I am sufficiently familiar with the facts and circumstances contained herein and that they are true and correct to the best of my knowledge, information, and belief. I understand that false statements are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities

Date: 5-31-2018

Joseph Juisti

41

## DEMAND FOR JURY TRIAL

Pursuant to F.R.C.P. 38, Plaintiff Joseph Juisti demands a jury trial by twelve (12) jurors on all claims.

Date: 05/31/18

Respectfully Submitted,

Gerard P. Egan, Esquire (20744)
Brian L. McCarthy, Esquire (319722)
Counsel for Plaintiff

43

# EXHIBIT A

EEOC Form 161 B (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

To:   Joseph Juisti
      3349 Alydar Road
      Downingtown, PA 19335

From:   Philadelphia District Office
        801 Market Street
        Suite 1300
        Philadelphia, PA 19107

☐   On behalf of person(s) aggrieved whose identity is
    CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 530-2017-02002 | Legal Unit | (215) 440-2828 |

(See also the additional information enclosed with this form.)

NOTICE TO THE PERSON AGGRIEVED:

Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA): This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☒   More than 180 days have passed since the filing of this charge.

☐   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒   The EEOC is terminating its processing of this charge.

☐   The EEOC will continue to process this charge.

Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Jamie R. Williamson,
District Director

May 29, 2018
(Date Mailed)

Enclosures(s)

cc:   Daniel C. Moraglia, Esq.
      Bennett Bricklin & Saltzburg LLC
      1601 Market St., 16th Floor
      Philadelphia, PA 19103

Brian L. McCarthy, Esq.
Egan & McCarthy
657 Exton Commons
Exton, PA 19341

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS    --    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**the Genetic Information Nondiscrimination Act (GINA), or the Age**
**Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to
consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell
him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely
manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as
indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of
your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the
charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include
any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters
alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in
some cases can be brought where relevant employment records are kept, where the employment would have
been, or where the respondent has its main office. If you have simple questions, you usually can get answers from
the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint
or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice *and* within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

EEOC Form 161-B (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: **Joseph Juisti**
**3349 Alydar Road**
**Downingtown, PA 19335**

From: **Philadelphia District Office**
**801 Market Street**
**Suite 1300**
**Philadelphia, PA 19107**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **530-2018-00024** | **Legal Unit** | **(215) 440-2828** |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

[signature]

**Jamie R. Williamson,**
**District Director**

May 29, 2018
*(Date Mailed)*

Enclosures(s)

cc:

**Daniel C. Moraglia, Esq.**
**Bennett Bricklin & Saltzburg LLC**
**1601 Market St., 16th Floor**
**Philadelphia, PA 19103**

**Brian L. McCarthy, Esq.**
**Egan & McCarthy**
**657 Exton Commons**
**Exton, PA 19341**

Enclosure with EEOC
Form 161 B (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --**      **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to
consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell
him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely
manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as
indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of
your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the
charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include
any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters
alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in
some cases can be brought where relevant employment records are kept, where the employment would have
been, or where the respondent has its main office. If you have simple questions, you usually can get answers from
the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint
or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):** The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

<u>If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.</u>

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.

➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities"** now include the operation of **major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

➢ **Only one** major life activity need be substantially limited.

➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**

➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

**"Regarded as" coverage:**

➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.

➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.